We'll hear the argument in Case No. 13-895, Alabama Legislative Black Caucus v. Alabama, and Case No. 13-1138, the Alabama Democratic Conference v. Alabama. Mr. Pildes? Mr. Chief Justice, and may it please the Court, Alabama employed rigid racial quotas, rigid racial targets, to design all its black majority districts based on mere racial statistics alone, and then used only racial demographic data to meet those targets with astonishing precision. These targets were not based on any consideration of what's required under current conditions in Alabama, as Section 5 actually requires. Racial quotas in the context of districting are a dangerous business. They can be a way of giving minorities faced with racially polarized voting a fair opportunity to elect, but they can also be a way of unnecessarily packing voters by race in ways that further polarize and isolate us by race. So you want, on the one hand, they obviously had to move new voters into the majority minority districts because they were all underpopulated, and they need to move enough so that the minorities have an opportunity to elect candidates of their choice, but they can't move too many because that would be packing. Correct? Your Honor, we understand that states are in a bind in this situation, as has been true under Title VII and under the Voting Rights Act under Section 2. So, but they have to do that. They have to hit this sweet spot between those two extremes without taking race predominantly into consideration. They don't have to hit a sweet spot. This Court has marked out a legitimate path that states can take and must take to comply both with their Section 5 obligations and with their equal protection obligations, not to use the excessive and unjustified use of racial categories. But the Section 5 obligation, it used to require that there be no regression in majority black districts, so that if a district went from 69% black to 55% black, you would be in trouble. Your Honor, Section 5 has always required no retrogression based on the ability to elect under current conditions. Right. So if there's no racially polarized voting... And they're saying that's all we did. You know, these districts were underpopulated with respect to other ones, so we had to move new people in them, and we had to do it in such a way that there was still the 69% black population that there used to be in order to avoid retrogression. Your Honor, retrogression has never meant merely reproducing racial statistics purely for their own sake. It's meant preserving the ability to elect, preserving majority and minority. Oh, you can say that, but it meant the only way to be sure you're not doing that is maintaining the same percentage, and that's certainly the way the Justice Department in the bad old days used to interpret it. It may be in the first decade or so of the application of Section 5, DOJ employed various kinds of practices, as you describe. As our brief documents in detail, the Department of Justice has routinely pre-cleared plans that reduce black populations as long as they don't reduce the ability to elect. And indeed, in Alabama, in the last round of redistricting, if you look at the blue brief of the black caucus at the chart at 8A, you will see that Alabama dramatically reduced black populations in all of its districts in the Senate and in virtually all of its districts in the House. And if you look at that chart, you will see numbers like a 12-point reduction, a 19-point reduction, a 10-point reduction, 16-point reduction. Why is that? They reduced districts down to 56 percent. Why is that? Why do you no longer need as high a percentage of minority voters to maintain a situation where minority voters can still elect their candidates of choice? For the reasons that this court adverted to in Shelby County and the reasons that Alabama rightly celebrates in its briefs. Black turnout and black registration rates in Alabama now routinely equal or even exceed white registration and white turnout rates. You realize, I assume, that you're making the argument that the opponents of black plaintiffs used to make here. They said, you know, by requiring packing of minorities into certain districts, you're reducing their influence statewide. So, you know, the representatives in other districts can ignore what the minority wants because they're all packed in. That's the argument the other side used to be making. Yes, Your Honor. And when the Voting Rights Act legitimately requires the use of race in the face of polarized voting, then there's a national political judgment that reflects the tradeoffs, the costs, and the benefits, as there are to designing these districts. Suppose a party A in 2001 takes minorities out of heavily minority districts and puts them into opportunity districts for political purposes. It's for partisan gerrymandering purposes. Assume that. Party B then gets into power ten years later. It wants to undo what party A did, and it puts them back into heavily populated districts. Is there a violation when party B does that? There's no violation. And it will stipulate that its motive is simply to help its partisan balance or partisan imbalance. If they do not use racial classifications, if they do not use the definition of race, they can't do it. They put minorities back into heavily packed districts, just as they took minorities out ten years before. Right, but the line this Court's precedents have drawn is precisely the line between partisan motivations in districting. In both of my hypotheticals, it's partisan. In either case, is there a violation? If it's purely partisan in motive and they don't use race, then there's no problem. But they do use race, but it's purely partisan. The hypothetical is, case one, they find minority voters and put them into minority opportunity districts, unpacking the very heavily minority populated districts. Then the next party comes in and simply undoes it. And it uses the same calculus, race. Your Honor, the... Are you going to tell me, is it your position? I think it may be your position. That in the first case it's permitted, in the second case it isn't. No, Your Honor, our position is that race can't be used excessively and unjustifiably in either case. And the three judge courts... Was it unjustified in case A when they were trying to have more minority opportunity districts? If they exceeded their obligations under Section 2 and Section 5, if they went beyond the limited leeway this Court has said that States have, if they have the strong basis and evidence that's required, if they properly interpret the Act, that's the legitimate path States have, that this Court... But they do this for partisan purposes. Your Honor... And I'm asking if Party B can then undo it for partisan purposes, because I sense that there's a one-way ratchet here. I don't think that's correct, Your Honor, and I understand the concern. If for partisan purposes a legislature passed a race-based barrier to voting, that would surely be unconstitutional. They can't use race in the way this Court's cases in the Shaw line of cases indicate are beyond the parameters that States have. They have to have a strong basis in evidence. In this case, Alabama didn't even ask the relevant legal question. Alabama didn't ask what is necessary to preserve the ability to elect, what might be necessary to preserve the ability to elect. They just reproduced numbers, statistics, and the way they did it is they just used racial data. Well, you began by criticizing Alabama for supposedly imposing quotas. But listening to your argument, it sounds to me that you are just as interested in quotas. You're just interested in lower quotas. Your Honor... ...that may be illegitimate in your view. But if they take it down to the minimum that would be required in order to produce the desired result, that's a permissible quota. So why are you using this term, quota, at all? You don't have to use the word quota. Why did you use it? I actually meant to use the word racial targets. Judge Thompson... Do you think there's a difference between the two? Well, there's a lot of rhetorical and inflammatory power in the word quota. But, Your Honor, the point here is that there must be at least legitimate basis for racial targets. So that's Justice Kennedy's question. I thought your answer would be, there isn't a one-way ratchet. That's Cro-Marty 2, isn't it? Doesn't Cro-Marty 2 say, if you're doing this for political reasons, because many, many African Americans vote Democrat, all right? And so what they're doing is they're trying to help the Democrats. So, yeah, we're trying to help the Democrats. Okay. If that's what you are doing and they can't really prove the contrary, the burdens on the one attacking the district, whether they're doing it by removing some African Americans from this one or by putting more into it, it's the same issue. Am I right? Yes, you're right. And it's not a one-way ratchet. It is a two-way ratchet, which... And it's valid in both cases. That's your problem. That's not our case, because our case, they don't try to defend on that ground. Right. And your answer is exactly the answer I was trying to give to Justice Kennedy, which is partisan manipulation, this Court has said, may be fine and constitutional. But the one thing you cannot do is use race as a proxy for politics or political affiliation. You cannot use racial targets that don't have a legitimate justification. They're not tied to current conditions. I thought you agreed with Justice Breyer. But now you're saying you cannot use race as a proxy for political affiliation. But that was his hypothetical. I thought these people were moved because blacks overwhelmingly vote Democrat. Your Honor... You're saying that's bad, if that's the reason they're moving. I don't think he thinks that's bad. I understood Justice Breyer to be describing a situation in which you're moving people because they're Democrats. You have voting behavior data. You look at the data. You're moving them because they're black, and you think blacks will overwhelmingly vote Democrat. That's why you're moving them. Because they're black, because we assume blacks are overwhelmingly Democrats. Your Honor, in this area, the Court has said that assumptions like that cannot be the basis of the way district lines are drawn or the way... Because the time is running out. In your presentation, you're saying we are attacking the statewide plan. We are not picking one district or the other. And you have been attacked on that point. The attack is that SOAR claims have to be district by district. They can't be statewide. So I would like your answer to that question. There hasn't been a SOAR claim, as far as I know, that was statewide. Your Honor, our claim is that the exact same policy was applied in every black majority district, which is we will use racial data to repopulate as close as we can possibly do it to the exact same black percentage. That's a policy applied in all 36 districts. And how are your clients hurt by that? It seems to me you have to come up with a client in one of the other districts that would have been, as you put it, more competitive had this packing not occurred. I assume that's the harm that you're alleging. Your Honor, the record demonstrates that we have plaintiffs or we have members of the ADC in many of the black majority districts at issue, and that, at least, is sufficient for us to challenge this policy to be applied in those districts. Your record just showed that you named your plaintiffs by county rather than district. But many of the districts are wholly contained within the county. They occupy the full county. We demonstrate in a brief number of Senate districts and many House districts. Isn't your district by district challenge? Does your claim rise and fall slowly on this statewide point you've made? By statewide, we simply mean a common policy applied to every district in the state. And, Mr. Chief Justice, if I may reserve the balance. Thank you, counsel. Mr. Staff? Justice, and may it please the Court. This Court's short jurisprudence channels the conversation that we're having today. This Court has identified two constitutional claims that are not in the statute. One is intentional dilution of minority votes for the purpose of minimizing their effectiveness. And the second one is Shaw. This is — we're advancing a Shaw claim. You lost on the dilution, correct? We did. Okay. We did.  The question is whether they fall within the concept of predominance in this Court's line of decision. Did the district court understand you to be asserting a district-specific claims? I think it understood us to be challenging each of the districts. Where do you find that in the opinion of the district court? I thought the district court interpreted you not to be making that claim. I — we advanced evidence as to the motive that was a motive common to all the districts, and then we advanced — offered evidence about particular districts to illustrate how that was played out. But this is not a — there's no conceptual difference between challenging all 36 districts and challenging 36 districts. It's the same claim. But you may have specific — in your proposed findings, you dealt specifically with certain districts and not specifically with others. The specific information dealt with many of the particular districts, but the claim was that all the districts were the result of a common purpose, that in that common purpose, race was the predominant and overriding — But some of the districts were unchanged. The percentage was exactly the same as it was before. And those are the only districts that your clients were from. How have they been harmed? Our clients — we have members in all the districts. The theory of harm in the Charlotte cases — Was that established in the district court, that you have members in all the districts? That was a finding of the district court. The Alabama — because this concerned the blacks — The finding of the district court was that you have — you have members — I think it said all or virtually all. But that wasn't — our standing wasn't in dispute. But the concept of injury in the Charlotte cases is not injury to the individuals who are in the districts that are — become whiter because blacks are moved out. Those are the people who don't have standing. In Hayes, this Court made clear, it's individuals in the districts into which blacks are put for the predominant racial purpose of — for predominant racial purpose. That's the standing doctrine that this Court has announced in those cases. Predominance involves — under this Court's decision — I don't understand what you just said. They have a claim because there are too many blacks in their district? No, it's not about the number. The theory of the Court in Shaw is that if race is the predominant purpose in putting blacks into a district, that that will likely result in representational harms in terms of the way the elected officials will act. And that's been the theory of the Shaw claims ever since Shaw. And you think it's possible for the State to navigate between not enough minority members in the district and too many minority members in the district without taking race into account? No, we do not. But Shaw doesn't say that taking race into account raises the constitutional question in all cases, particularly in the wake of this Court's decision in Easley, which made it clear, finally resolving an issue that had been kicking around for some time, that the fact that race was a factor in drawing a district doesn't trigger strict scrutiny. The majority of the Court held there that for Shaw purposes to trigger strict scrutiny, the plaintiff would have to show predominance, that race was the predominant overriding purpose, meaning it was the criteria to which — that couldn't be put aside for any other purpose. So they have to navigate between too many and too few but without race being the predominant consideration. If race — in terms of the Constitution, if race isn't the predominant purpose and dilution isn't involved, then there's no constitutional claim. With regard to Section 5, I think it would be helpful to understand what the government's interpretation is and has been for some time about what Section 5 requires. This is reflected in the government's brief at 22 and 23 and at the 2011 guidelines. The government's view, and this is how this has long been understood, is that the black proportion can be reduced to the point where blacks no longer have the ability to elect a candidate of their choice. Until you get to that point, changes are not retrogressive. And that's not the way — Do you think — what do you think — well, it's speculative, but I think that if Alabama had reduced the number of minority voters in majority-minority districts in any significant way, the Attorney General would have come down on them like a ton of bricks. That is not correct, Your Honor. He did pre-clear the plan that you're challenging today. He also pre-cleared the 2001 plan, which did precisely what you described. The government's view of this is set out in some greater detail in their brief in Georgia v. Ashcroft and in the oral argument of Mr. Stewart at the time. As they explained then, and this remains their view, and consistent with the way the Department has operated, until the numbers can fall until it gets to the point where the ability to elect is in question. I have a problem. Can I just go back to your Shaw-Nonshaw? Yes. Basically, you're saying, I don't have a Shaw challenge. No, I have a Shaw challenge. All right. You're claiming it's a Shaw challenge, but you don't have to describe the injury. It's an ephemeral injury of race played a part in the overall plan. Without an effect in a particular district. No. In a particular district, if it stayed essentially the same, they didn't move the boundaries much. It's an all-white district. If they moved the boundaries, it wasn't to include more blacks or anything else. It was just because of geographic divisions. So explain to me why you don't have to prove that you were harmed specifically by the application of this policy. There's two things in response to that. First, the theory of Shaw is that if black voters are, for predominantly racial reasons, moved into a district, not just leave it alone, moved into a district for predominantly racial reasons, that would trigger scrutiny. But that wasn't true in every case. Yes, it is. Yes, it is, Your Honor. When one of those courts said the districts hadn't changed, I think what he meant was the black percentage hadn't changed. All of these districts changed. They were underpopulated by, on average, about 15 percent. There was an average of 6,000 voters, individuals put in every House district, 20,000 in every Senate district. Now that you're talking about districts, could I come back to the question I asked at the beginning so that I understand what we have to decide? On page 128 of the Joint Appendix, there's a paragraph in the district court opinion that explains what the district court understood to be before it on the issue of intentional discrimination. I see nowhere any indication that the district court construed your pleadings and your other submissions to raise a claim about any specific district. The third point is we construe the filings of the Democratic conference plaintiffs as arguing that certain Senate districts constitute racial gerrymanders. There's nothing like that with respect to your client. Maybe I'm missing something. So if that's how the district court understood your position, then maybe it was wrong. But that would be the threshold question we'd have to decide, wouldn't it be? That if you have to be district-specific, we would have to say the district court misunderstood the claims that you were asserting. I think in the context of the way the case was litigated and tried and the briefs at the time, it was everybody understood the plaintiffs were challenging all of the majority black districts. The district court understood that? And why did it include this paragraph and why did it not go through any districts that it saw you as challenging? It went through some that it saw the other plaintiffs as challenging, none with respect to you. We think in the context of the case that was litigated, there was no conceptual difference between challenging all the 36 districts and challenging 36 individual districts. The reason the opinion reads the way it does is that the State didn't contend, and we didn't contend, that there were different district-specific purposes afoot. The State's account of this, which everyone accepted, was that the State had a common purpose in adding those thousands of individuals to each district, which was to continue the black percentage as it had been all along. It was a purpose common to all of them. And, Mr. Schnapper, isn't it right that after trial, when you submitted proposed findings of fact and conclusions of law, in fact, you did reference particular districts? You referenced Senate District 18, 19, and 20. In another place, you talked about all the majority black districts in the State's black belt, and you explained how your theory of the case related to each one of those districts. We did. This is somewhat analogous to the Teamsters decision from back in the 1970s, where the government, to prove racial discrimination in promotions, made out a pattern practice case by offering evidence that was class-wide, that affected all the individual blacks and Hispanics, and then offered some individual stories. But the claim was for all of the individuals who worked in those facilities. To get there, you're talking about second. We can strew the filings of the Black Caucus plaintiffs as arguing the acts as a whole constitute racial gerrymandering. So we have to say that was wrong, they didn't get the complaint right, send it back. So if we're going to have to send it back, I guess, would there be anything wrong with saying this? Tell the plaintiffs, please, to point district by district to the fact that the primary motive here was racial. I don't think that would be too hard. You have loads of evidence on that. Now, if the primary is racial, and this is the crucial part, they then, to justify this, have to show that they are making a, and I don't know what word, reasonable attempt, good faith, reasonable attempt, some other word, to comply with the section, old Section 5 requirements. With the Section 5 requirements. And now, if we have a, they have to do it over again anyway, and so they do it over again, and if, in fact, some of the questions suggest that that is what they were trying to do. And you have evidence there that says, no, no, that isn't what they were trying to do. They didn't even read the guidelines of the Attorney General. They didn't even look at what happened in the past. They made no such attempt. All right. So would there be, from your point of view, anything wrong with that holding? Well, Your Honor, I think, with regard to the question of justification, we think it doesn't make any sense in light of this Court's decision, particularly in Shaw 2, to send it back. The Court's decision makes clear that there are three parameters to the way you assess this. First, what they did is to be judged by the correct interpretation of the statute, not what they might have thought in good faith it meant. And the word correct is in a number of this Court's Shaw decisions. Secondly, that the purpose to comply with the correct interpretation has to have been their motive at the time. And secondly, at the time, not at trial, but back when they did this, they had to then, in 2012, have had a strong basis in evidence for concluding that not using all these different numbers would have violated the statute. They don't have — they can't satisfy any of those things. They can't go back. You could send the case back to the district court, but you can't send the case back to 2012 and have them change the purpose or change the evidence before that. So unless you're going to change the standard of strict scrutiny that's qualified in Shaw and other affirmative action-related cases, you could not do that. It's just — it's years too late for them to solve those problems. And — I'm still having a psychological problem with your point. There were three reasons. You're saying merely because it was one among the three. It necessarily was predominant as to each district created. The example or hypothetical I posited for you was the primary reason, above all others, that they said it was a 2 percent district. And there may be districts among these 36 that, as I indicated, had contiguous populations that didn't make a difference about race. So it didn't — they're not affected by this policy. Why should we undo that? Okay, okay. There — if I may just answer the one last question. The — in fact, as the analysis of the precinct splitting shows, with perhaps two exceptions, there is race-based precinct splitting on the border of every one of the majority black districts in question. It wasn't a situation where they just took the neighboring districts and they turned out to replicate to be just the ratio that they wanted. It was very, very calculated and race-based. Thank you, counsel. Thank you. General Beroulli? Mr. Chief Justice, and may it please the Court, the key point in this case is that Shaw claims required district-specific analysis. The district court departed from that principle, and in our judgment the plaintiff's main theory also departs from that principle. And I'd like to — I don't understand why that's so, General. I mean, what the plaintiffs are saying is, yes, we have common evidence, not altogether usual in a Shaw claim, but here they have evidence. It's a policy statement that retrogression was going to be a very main priority. I think it was number two. And retrogression was defined in a certain way as requiring the maintenance of black voting population. And that was going to be taken into account in every single majority-minority district. Now, the fact that there's evidence, the principal evidence in the case, that relates to every single district, and so, in a sense, the evidence is statewide does not make it any less a district-by-district case. That may be right, Justice Kagan, but it also doesn't prove that race predominated in the Shaw sense with respect to each specific district. And let me try to explain why. The test under Shaw is whether race predominates to the derogation of traditional districting criteria. And so it may be that in some districts, the effort to maintain the same African-American population resulted in judgments that — to draw the districts in ways that derogated from traditional districting criteria, such as compactness and maintaining communities of interest. But it may be in other districts that it didn't, and I can provide specific examples of that. Well, I guess I would appreciate specific examples, because it seems to me as sort of a going-in matter that when you say this is the most important thing, except for the Reynolds inquiry, this is the most important thing, that necessarily it's going to affect the way you redraw or who you put into the districts. You might not reach the target in every single district, but necessarily you're saying we are prioritizing this race-based thing, criterion, in a way that's going to affect every judgment we make. But the question under Shaw, Your Honor, as we read the Shaw line of cases, is whether that is done in derogation of traditional districting criteria. Well, how could it not be if you have three priorities or three criteria, and you say this is the absolute most important criteria. It's just the natural effect of that is going to be to minimize the other two criteria. No. That's not necessarily true. Sometimes they'll conflict. Sometimes they won't. And I think the example — I can give you examples, I think, that would illustrate that from the record. For example, now, there weren't specific findings about these districts in the district court's opinion, so I'm not trying to say that this is what the district court found. But with respect to some districts, for example, House District 67, the state argues that that was a district in which you were going to have essentially an African-American percentage at the percentage that the district was drawn at, no matter how you drew it. And that was because the surrounding populations around that district were all of comparable African-American percentages. So whatever choice you made in order to get to the 2 percent one-person, one-vote threshold was going to involve moving African-Americans. And we'd submit that's not a situation in which race predominated over traditional districting criteria. It's a situation in which traditional districting criteria drove the decision. There may, however, be other districts, and Senate District 26 is one that comes to mind, in which — where you had this movement of 14,500 people into a district, which was in the city of Montgomery and surrounding areas, all but 35 of whom were African-American. And if one looks at that map, and actually it's very difficult to discern in the small maps that are in your materials, but if you could get a blow-up of it, what you will see in that map is that the so-called crab claws that the parties described that extend out from the district capture African-American populations. But what they do is carve out the white part of the city of Montgomery and attach it by a very narrow landscape. Suppose they did that based on economic data.  But it results in the same thing. Right, but it wouldn't be race predominating over traditional districting criteria. And I will go back and try to answer the question that Your Honor posed earlier about when partisanship can be a justification and when it isn't. And I think it's a very technical answer, but I think if a state were to move electoral precincts from one district to another, the entire electoral precinct, because there you would have the data on how people voted in that precinct, that would not raise a problem under the Shaw analysis because you would clearly be making a decision for partisan reasons. But when you split a precinct and you move just based on census block information, there you don't know how the people in the census block voted. What you know is their race. And so at that point, if you're using race as a proxy, and I think that's what Mr. Pilgrims was trying to describe, Your Honor, when you're using race as a proxy in that circumstance, that would violate what this Court has said in all of its Shaw cases is the constitutional norm at stake here because you're making an assumption you're stereotyping in that situation. And that's true at the outset if you move them by race in order to increase their capacity to influence districts? Well, that's a difficult question, Your Honor. But I think if you're moving people by race in order to ensure that you're not violating the Voting Rights Act, that seems to be a one-way ratchet. No, I don't think it is a one-way ratchet, Your Honor, because you could move in both directions, just move precincts and not census blocks. General, you say that the district court erred in addressing the claim of racial gerrymandering on a statewide rather than a district-specific basis. I would assume that that was an error on the part of the district court only if a district-specific claim was asserted by the plaintiffs. But you don't address that issue. Yes, I'm happy to address it now, Your Honor. I actually think this is quite a murky question. I think, you know, we agree, Your Honor, it's quite right that the district court did appear, and JSF 128 is a place where it seems clear that they did appear to assume that this was a statewide claim. In some respects, one can understand why, because the basic theory is that the motive influenced every district, and it did adjudicate the case on that basis. So it would seem to me that one outcome here would be to say that Shaw, the proper understanding of Shaw is that claims have to be made on a district-specific basis and that the plaintiffs here didn't propound cognizable claims under Shaw, and that would be one resolution here. But I have to say, the record is somewhat murky on this. Judge Thompson, in dissent, did say he thought that the claims were district-by-district-specific. Justice Kagan has identified some information in the record. So another option might be to articulate the correct district-specific standard and leave it to the district court on remand to sort out whether the plaintiffs have a say. But you don't deny that a statewide policy can refer to every district or every majority-minority district in the State. No, we don't deny that, but that's not enough. Our point is that's not enough to trigger strict scrutiny. You have to look and see whether it's implemented in a manner that is in derogation of traditional districting criteria, district-by-district. But, again, and I don't want to press it if you've given me your best answer to it. If a policy says we're going to prioritize this particular criterion, which here was the mistaken understanding of retrogression, if a policy says we're going to prioritize this over everything else, it seems to me that that's pretty good evidence of a violation. Only if, again, I guess I am just going to repeat myself, but if it's in derogation of traditional districting criteria. If the policy says that it's going to prioritize it over everything else, that means it's going to be in derogation of traditional districting criteria. When they conflict. Sometimes they might fail. Sometimes you're not going to be able to prioritize it over everything else. But the intent is still to prioritize it over everything else. But the question is, let me take a step back because I think it might help to put it in this context. A challenge, a Shaw challenge, is a challenge to a facially neutral government action. The lines on the map are what are being challenged here. That's the government action. Those lines are facially neutral. They may, in fact, reflect a violation of the Constitution under Shaw if race predominated in the placement of those lines and derogation of traditional districting criteria. But that's what you've got to prove. And the mere existence of this motive doesn't prove it for each district. And that's our point. If I could, I just would like to raise one point in my remaining time, going back to the question of what Section 5 retrogression would require. And, Mr. Chief Justice, you asked that question. And when you do that, will you also tell us what effects, if any, the preference should have? Yes. So, and the two are quite related. I think Professor Pildes referred you to this chart. And the key thing is to look at not the difference between 2001 and the current plan, but the difference between the 1993 plan and the 2001 plan. The Justice Department cleared the 2001 plan that Alabama submitted. And you will see for every single district listed there, with maybe one exception, there were significant reductions in the minority percentages in those districts. So Alabama knew perfectly well that it was completely consistent with its obligations under Section 5. It reduced the districts. You asked for a remand. The result of the remand may well be Alabama has to redistrict. Is that right? Yes. And when they do so, that would not be subject to Section 5? Certainly correct. That's certainly correct. And that's not a concern for you? Well, it's not a concern for us. It is what it is, Mr. Chief Justice. If on remand the district court concludes that some of these districts violated the Constitution, then Alabama will have to, this legislation will get its first chance to legislate a fix. And Section 5 won't be a basis for them to take any action. Thank you, counsel. Mr. Brasher. Thank you, Mr. Chief Justice, and may it please the Court. I think the Court should begin with the district court's fact-finding. Because the district court expressly found that race did not predominate, and the Court can affirm on that basis and avoid addressing questions about Section 5 and redistricting that are unlikely to rise again because of this Court's decision in Shelby County. On page 144 of the jurisdictional statement appendix, the district court expressly found that we did not impose a quota. The Court says that we imposed, quote, no bright-line rule. And what the Court meant is that we preserved the core of existing districts. We followed pre-existing district lines. We followed roads. We followed county lines, municipal lines. We met the needs of incumbents, and we preserved communities of interest. The plan that we proposed, the plan that we passed, is a status quo plan. The whole point of this plan was to preserve the status quo because the Republican Party had won a majority in the legislature for the first time in 130 years. But the other side says it was impermissible for you to preserve the status quo because the opportunity for minority voters in the majority-minority districts to participate in the electoral process had improved to the extent that maintaining the status quo would be characterized as packing. Well, actually, if you look at – well, two responses to that, Your Honor. The first is that if you look at the Mikis brief filed in support of neither party by political scientists, they show that black voter turnout and white voter turnout and registration actually equalized in 1998. So there actually isn't some difference between the districts in 2010 and the new ones that we proposed with respect to those criteria. The second point I guess I would make to that is that our redistricting criteria, our non-racial redistricting criteria were coextensive with the objective here to preserve these majority-black districts as they have been. And what I mean is that the objective of these non-racial redistricting criteria was to preserve the status quo. And so I think that's what the United States Solicitor General was getting at, is that it's difficult to disentangle the notion that we should preserve the status quo of the majority-black districts. Is it fair to read the pleadings and submissions in this case as saying that the state did not send this plan on the basis that it was for partisan purposes, but that it was to comply with Section 5? Is that a fair reading of the A, of the red brief, and B, of what the district court found? I don't think it's a fair reading of either, Your Honor, and this is the reason why. Certainly with respect to specific districts here, when they were actually challenged, we were able to respond and say this was for partisan political reasons. One of those districts, for example, was Senate District 11, which was specifically challenged by the Alabama Democratic Conference, and the district court held that the changes to that district were based on politics. Now, with respect to the plan as a whole, our response has always been that there is a lot of factors that went into drawing the plan as a whole and went into drawing any specific district. And I think it's important here that the plaintiffs have never proposed a redistricting plan that actually meets our race-neutral redistricting criteria, especially the 2 percent deviation in population that the legislature adopted. And I think that's important for three reasons. Are you really saying that that's a pleading requirement, that they have to come in with a plan that meets all the rest of your criteria? I do not believe that is a pleading requirement. I believe it's an evidentiary issue, and I think the court held that much in Cromartie. And I think it's important for three reasons. First, the legislature adopted that 2 percent deviation to end the previous partisan gerrymander that the Democrats adopted in 2001, where they systematically underpopulated majority-white districts and overpopulated majority-white districts in Republican areas of the State. And that's why the plaintiffs brought a partisan gerrymandering claim in the district court below. And the second reason is what I was alluding to earlier, and that's in ease with you, Cromartie, the court held that the first step of a racial gerrymandering claim is to show that there's some conceivable way to do this differently that creates greater racial balance. And the fact that they never produced a plan that actually does that is a serious problem. And that makes sense, because if you want to see if race was predominant in redistricting, you take race out, and then you run it again, and you see what happens. Mr. Bashir, I mean, let me just give you some numbers here from some of these districts, right? H.D. 52, you needed to add 1,145 African Americans in order to maintain the percentage of African American voters, which was your number two criterion. You added 1,143. You missed by two. H.D. 55, you needed to add 6,981. You added 6,994. S.D. 23, 15,069. You hit at 15,185. I mean, those numbers speak for themselves, don't they? That in each of these cases, you were determined, come what may, in disregarding other criteria, to maintain the black voting age population. I don't think that shows that for two reasons. First, I agree with the United States Solicitor General that the question here is whether we subordinated race neutrally districting criteria. That was just a coincidence? No, but that goes to my second point, is those House districts that you were reading off are in the city of Birmingham. The city of Birmingham has over 200,000 people, and it's 73 percent black. Well, it's 73 percent, and you hit that 73 percent exactly. Well, that's my point. There are at least going to be some of those House districts in Birmingham that are 73 percent black, and I do not believe that in a place where there's more than 200,000 people and 73 percent of them are black, you need to subordinate race neutrally redistricting criteria to draw a 73 percent black district. Well, I think you kind of do, actually, because, I mean, you're trying to repopulate these districts, and many of these districts, yes, there are many, many, many African Americans, but as you just suggested, there are also white people. And you did it so that you, you know, completely replicated the exact percentage figure. Well, I'll give you another example of what I mean. House District 67, which we talk about in our briefs, is a single-county district. It's always been a single-county district. It's a single-county district in our plan, and it's a single-county district in every plan that the plan has proposed. And it's always going to be 70 percent black because that county is 70 percent black. And I think the same thing could be said about many of the neighborhoods in Birmingham, is that these neighborhoods are 73 percent black, and that's how we hit those numbers. And they certainly haven't proven otherwise. I also think that the 2 percent, the failure to propose a 2 percent plan is important because a 10 percent plan, the plans that they've actually have proposed, are drastically different from a 2 percent plan. It's like comparing a plan with 100 districts to one with only 80 districts. Their Senate districts can vary by 14,000 people, and ours can only vary by around 2,000 people. But even though these plans are drastically different with respect to the criteria that the legislature adopted here, many of their districts have exactly the same black population percentage as our districts. This is clearest if you look at page 36 of our brief where we lay out the Senate districts and their own proposed plans next to the Senate districts in our proposed plan. And you'll look and you'll see Senate District 18, 19, 20, some of the Senate districts that Justice Kagan was talking about earlier, are almost exactly the same in all three plans. If you look at Senate District 33, it's exactly the same in our plan and in the black caucus's proposed plan. The evidence was that the only way you could draw Senate District 33 with a different black population percentage. What about Senate District 26? Senate District 26 was above 70 percent black in the previous plan, and it's above 70 percent black in our plan and in the black caucus's plan. Now, it's not exactly on target, but the plaintiffs testified in this case that the area of Montgomery City that we're talking about here is 99 percent black. And because that was one of the Senate districts that they actually challenged, we have actually good faith credibility determination from the trial court because the drafters actually testified about why they made the changes to Senate District 26 they made. And they said that because of the way population shifted, they had to change an adjoining district, Senate District 30, which required changes to all the rest of the districts, and that left a county, sort of an orphan county, Crenshaw County, as a rural county south of Montgomery. They explained that what they did is they took part of Senate, former Senate District 26, took it out to make a way to connect the rural Crenshaw County to the rest of Senate District 25, which was already predominantly rural. The Solicitor General just said that if you look at that district, it has a very bizarre shape, and the effect of the bizarre shape is to pull in predominantly African American areas and exclude predominantly white areas. Is he correct on that? Actually, I respectfully disagree with him about that. If you look at the comparison map, it's in the Joint Appendix on 197, you can see a comparison between the former district and the current district. And what you'll see is up at the right, I'm sorry, I'm ordering myself, the left up, the left part of Montgomery County, that's where the former district used to be.  Sort of a, kind of came in the middle of it. And what the drafters did here is they drew the lines closer to the city of Montgomery and they preserved that part of Senate District 25 that came in the middle of it. The only thing they did is they took some precincts and some parts of precincts, kind of along those lines, and they moved them from Senate District 25 to Senate District 26. And I want to also just correct something that my friend the Solicitor General said. We didn't just move white voters into that district. We also moved Hispanic voters into that district. We moved white voters into that district. We made changes to that. Mr. Grasher, I mean, usually in these cases, you're looking at these funny-shaped districts and you're trying to figure out from the shape and from other matters whether race has been used instead of traditional districting criteria. But this is a very sort of, you know, this is a sort of sui generis sure claim. Because here the principal evidence in the case is not all the circumstantial stuff that we usually do. It's a policy statement from the state that says race non-retrogression is going to be our principal criterion except for Reynolds. And then a clear testimony from the people who were applying that policy statement that they thought that that meant maintaining the black voting age population, something which is a mistaken understanding of what retrogression entails. But, you know, you don't have to look at all the circumstantial evidence about the shape of districts when you have a policy statement from the state saying this is our number one criterion except for Reynolds and this is how we understand it in such a way that it's going to ensure that a 68 percent district stays a 68 percent district and a 52 percent district stays a 52 percent district and so on. Well, just two quick responses to that, Justice Kagan. The first is that the state is always going to say that complying with federal law was a top priority because federal law is supreme. So this is much more than that. This is very specific saying where the two legislators principally in charge of this said this is what we understand the requirements are, that we're going to maintain the black voting age population in each district. Well, that brings me to my second point, which is that imagine had we done the same thing that the plaintiffs are suggesting and we had higher political scientists to tell us that 55 percent should be the target. I don't think that we could say that race predominated in that circumstance just because we had a different target. And so I think they are bringing effectively a circumstantial case here. They have the fact that we said that this was our objective under Section 5. Well, no, but Justice Kagan's question points up the fact that the defenders of this plan did not rely on the fact that it was a political gerrymandering. And, of course, they said there was the 2 percent goal, but the basis was race in order to comply with Section 5. And my point about that is that certainly with respect to specific districts, they were based on partisanship. And so had they challenged specific districts, we would have responded in kind with respect to those specific districts. But they never challenged specific districts below. And I think to answer Justice Alito's question, to my friends on the other side, I think you should look at Document 194, which is the Black Caucus's post-trial brief. And although they certainly mention an occasional specific district, they don't have any evidence. I guess this goes back to Justice Kagan's question. This is a circumstantial case because the only evidence they have— Senate District 26 was challenged by the Alabama Democratic Conference, which has now not brought a shawl frame with respect to Senate District 26. And because they specifically challenged that district, you actually have, like I said, a credibility determination by the district court about the testimony with respect to that specific district. Let me ask you about this Section 5 mistake. Isn't it so that both the district court and Alabama were laboring under the impression that retrogression meant you have to keep the same numbers? The district court made an express fact-finding here that our goal was to prevent substantial reductions in black population in the pre-existing majority black districts. And if that's a misunderstanding of what Section 5 requires, then the whole thing is infested by that mistake. Well, I disagree with you respectfully about it being a misunderstanding because I think in 2006, Congress told us that we could not diminish the ability to elect black voters in the pre-existing majority black districts. My friend, Professor Pildes, testified against the inclusion of that language in Congress, and he told them that if they included that language, it would, quote, walk into place, end quote, the majority black districts in the South. If you cannot diminish the ability to elect, that means that if there is a safe majority black district where there is a 100 percent chance that black voters can elect their candidates of choice, you cannot drop that to where they simply have a 50 chance or a 60 percent chance. And that was what we were setting out to do. And this Court has said that states get leeway in complying with Section 5 and the Equal Protection Clause, that we do not have to hit things right on the dot. Mr. Brasher, I guess I don't understand your response to Justice Ginsburg. I mean, there are different interpretations of what those 2006 amendments mean, right? Under one interpretation, it was basically a codification of Justice Souter's opinion, and so majority minority districts could be transformed into influence districts. On another, stricter interpretation, perhaps, no majority minority districts had to stay majority minority districts. But in no interpretation does a 76 percent district have to stay a 76 percent district when circumstances change and when the ability to elect candidates of one's choice does not require it. Well, this is what Justice Souter said in his dissent in Georgia v. Ashcroft. He said, quote, if racial elements consistently vote in separate blocks, which it's conceded that they do in Alabama, decreasing the proportion of black voters would generally reduce the chance that the minority group's favorite candidate will be elected. The majority opinion in Georgia v. Ashcroft agreed with that as well. And the district court in Georgia v. Ashcroft, which I think that Congress was trying to go back to, said that, quote, if existing opportunities of minority voters to exercise their franchise are robust, a proposed plan that leaves those voters with merely a reasonable or fair chance of electing a candidate of choice may constitute retrogression, unquote. And the testimony from the plaintiff's own expert here was that majority black districts in Alabama that are only 55 percent black would only give those voters a reasonable opportunity to elect. Supposedly, I don't know, I want to know what you think about the practicalities of sending this back. I assume, in the back of my mind of just relying on state policy, is this. A state legislator gets up and says, in our state there's a history of discrimination against black people. There are very few black representatives in this body. I would like to find a way of drawing district lines so that we have a few more. Okay? That's the normal way this case comes up. This is an obverse and odd situation. All right, I don't know that that statement should automatically disqualify his plan. Maybe we should look a little further into it and see what they actually did. I suppose I start there, and then I say, okay, you will proceed district by district. I suspect they'll be able to prove that at least in some districts, at least in some, the statement of the legislator here did prevail and did make a difference. Now, if that's so, they don't have Section 5 to rely on as a defense. So I don't know what the defense is possibly going to be. And since we can't even think what the defense is, why don't they just redo this plan over in the legislature and save everybody a lot of time and trouble? What's your response to that? There are a couple of responses. The first is I think we do have a lot of trouble to redo a plan. Is it not a lot of trouble? It is a lot of trouble. My point of my question is, is you want to go to that lot of trouble before a lot of extra trouble in court proceedings, or you want to go to that trouble right off the bat and get it over with? Now, I expect you to have an answer to that, and I'm not taking a point of view. I just want to know what your response is. Well, to respond to that pointed question, this time was passed after 21 hearings held throughout the state of Alabama. It was passed after extensive legislative negotiations. It was passed in a special session of the Alabama legislature that was called for the purposes of enacting a redistricting plan. And so we do not want to go back through that process. Of course you don't. But my question is, is there going to be a defense left that could stop you from having to go back? Yes. Why? Well, I think the United States agrees with me that the question here is whether there was a strong basis in evidence for us to believe at the time that we passed this plan that we had to comply with Section 5. And I think we have that defense even if we're litigating district by district. But let me say something else. What does it mean to comply with Section 5? And that's where you can say strongly, yes, and comply. Everybody agrees that that counts. Compliance with Section 5, strong interest in doing that. But if you think Section 5 means you've got to preserve the same numbers, and that's not what Section 5 means, then there's no premise on which the district court's basic decision was wrong. Well, I don't think so because I think the district court's decision was premised on the fact that race was not the predominant factor in this plan. But to go to that, the question about Section 5, we adopted a very reasonable Section 5 preclearance strategy here. It was the exact same thing that Georgia did in 2005 and that Congress said in the House report when it reauthorized Section 5 in 2006. If that turns out to be wrong, I guess you're still not guilty of using race. You're still trying to comply with Section 5 as opposed to being racist, right? That's exactly right. They did make intentional discrimination claims in the district court. If the district court said that race was not the purpose of this plan, in the district court's view, what was the purpose of the plan? Well, I don't think there's a need for a district court to identify any one specific purpose. I'm asking that in this case, what did they say? Wasn't it the assumption that they wanted to assure preclearance under Section 5 and for that reason use race? So when you say the district court said, well, race was not the purpose, it was close to the purpose because they were trying to use Section 5 and use race for that reason. That's a very fine distinction. Well, it was certainly a purpose that went into the majority of white districts, but it was not the predominant motive in the way these lines were drafted. I don't understand it. Don't you have to use race to comply with Section 5? That's right. Is there any way to comply with Section 5 without using race? There is not. You don't have to use race in this way, Mr. Brasher. Nobody would say that Section 5 required you to maintain a 78 percent district and a 78 percent district was no longer needed with respect to a group's ability to elect a candidate of choice. Well, I respectfully disagree with that. And once again, we followed the same preclearance strategy that Georgia followed in 2005. And Congress made a record in 2006 to try to reauthorize Section 5, and part of that record was them saying that Georgia's plan from 2005, which kept all of their majority white districts exactly the same, was a good thing. We did the same thing in this redistricting cycle that other states did in this redistricting cycle. We actually did the same thing that the plaintiffs did when they were in charge of the legislature in 2001. There's been some inconsistency on that. The only difference is that they tried to hit targets from the 1993 plan as they were in 1993, and we simply tried to keep the districts the same from 2010 to 2012. Could I follow up on Justice Breyer's exploration of what would happen if this was done over? I assume that Section 5 would not be a consideration so long as a new coverage formula is not adopted by Congress. Is that correct? Correct. If the legislature were to pass new plans, I do not think that they would have to comply with Section 5. And the legislature could do whatever it wants if it relies purely on partisanship rather than on race. To what degree would the legislature be justified in doing, and to what degree would it be required to take into account the degree, if any, to which Section 2 imposes something like a retrogression requirement? Do we know what that might be? I really honestly do not know how Section 2 would necessarily apply in this circumstance because by it complying with Section 5 here, we necessarily comply with Section 2 because it's a lesser standard. But I do think that it's the fact that we could have done — if the plans vacated, they're very likely to just be the same plans reauthored. Well, what happens there? If on a do-over, the objective was to produce maximum Republican representation in both houses of the legislature, and in doing that, there was a drastic reduction in the number of African-American senators and representatives. Would that be a violation of Section 2? Not necessarily. There would obviously be a lot more that would go into that analysis, whether that violated Section 2. You'd have to look at each individual district and see if they can make a Section 2 plan. I mean, one of the issues in this case is that this plan actually gives proportional representation to black voters in Alabama. There are about 25 percent black voting age population in Alabama, and they have about 25 majority black districts in the House and about 20 — I'm sorry, about 25 percent majority black districts in the House and about 25 percent majority black districts in the Senate. So this is — this plan meets Section 2 in that regard in the sense that it gives proportional representation. But I do not know what would happen, quite frankly, if this — if the Court were to vacate these plans and the legislature were to just do a do-over. And I would — to go back to the 2 percent deviation, these are very sophisticated parties on the other side of this case with very sophisticated counsel. The reason they've never proposed any way to do this following our own race-neutral redistricting criteria is because they know that the 2 percent deviation here prevents them from gerrymandering districts to help white Democrats get elected, because it would be very simple. The 2 percent deviation was adopted at the very beginning of this redistricting process, so the plaintiffs had a year while they were on the committee, the reabortion committee, to come up with their own 2 percent plan. And instead, they just proposed these 10 percent deviation plans in the legislature. And then we had a year of litigation for them to come up with their own 2 percent plan, and they didn't do that. And that's what the district court was getting at when the district court said, you know, because we followed race-neutral redistricting criteria. And then the district court suggested, you know what? You know what this case is really about. It's about the 2 percent population deviation. Mr. Brester, you're suggesting that there's some necessity for a 2 percent plan, but there is no necessity for a 2 percent plan. States have routinely gone up to 10 percent without getting into trouble under Reynolds. So that can't insulate your plan from this kind of challenge, can it? Well, I think it can, and for this reason, is because we're in charge of adopting our race-neutral redistricting criteria. And under Easley, if the plaintiffs want to prove that race predominated in the plan, the first step of that, and certainly the easiest way to do it, is to propose some other way of meeting race-neutral redistricting criteria that provides greater racial balance. And they haven't proposed any way to do that. And the plans that they did propose, even though they're 10 percent plans, are very, very similar in many of these majority of white districts. So not only have they not proposed a 2 percent plan, that's our criteria, but they actually — the plans they did propose are not that different. I think at the very least, the fact that the plaintiffs have never proposed any way to do this redistricting that actually meets the State's race-neutral redistricting criteria underscores that you cannot find that the district court's fact-finding here was clearly erroneous that race did not predominate. And I think the Court should affirm on that basis. Let me address the question of remand for a second here. The United States has said that the Court should remand this case, but the United States' position on that is internally inconsistent because the United States agrees that the population percentages alone in the districts are not sufficient for the plaintiffs to have met their burden of proof to show that race predominated. But that's the only evidence they introduced about these districts. And that's why the district court said, to the best that I can tell, these are statewide challenges, because the only evidence in the record, whatever they may have said, the only evidence in the record about these districts was just population statistics. You'd look at the complaint. When I look at the complaint, I suspect I'll find something about districts. It's certainly true that sort of taking the U.S. point of view, it's quite clear, to me anyway, that the Court decided it on the basis of a statewide plan. So if it's wrong about that, then they ought to have a chance to go back and make their claim district by district and have a decision on that basis. Well, and once again, I don't think they may have brought claims with respect to each individual district. I don't think they do. I think if you look at the complaint, you won't find that. But even if they did, the only evidence that they introduced about any of these districts are the statistics alone. And the United States agrees with me that that's insufficient for them to have met their burden of proof. So I don't see how you could reverse the district court's fact-finding as clearly erroneous that race didn't predominate, given that all they introduced was statistics. I think the Court should affirm on the basis of the fact-finding and not reach questions about Section 5. Unless the Court has any other questions, that is fine. Thank you. Thank you, Counsel. Professor Pildes, you have two minutes remaining. Thank you very much, Chief Justice. If I can, I'd like to address... Let me write on that last point. Earlier, one of the two of you said that if you looked at the division of precincts, it was done on the basis of this policy in almost every district. Was that shown below? We introduced all of that precinct-splitting information below. And in our proposed findings of fact, Document 196, some of which is reproduced in one of the briefs, we made exactly this point. Yes, Your Honor. Besides the statistics, what other evidence did you present? Your Honor, we... I didn't go back to the joint appendix, but I just want a summary of it from you. Your Honor, the key fact we presented, I think, that hasn't been discussed here, is that the Alabama Constitution prohibits the splitting of counties. And they say they had a supremacy clause obligation to meet these racial targets. And that meant they could override the Alabama Constitution's protection of county boundaries and all other state traditional districting principles. And the 2% rule works the same way. If that's actually a federal constitutional requirement, they can also override the key protections against partisan gerrymandering, the very few that exist, the only hard constraints, the county boundaries or political subdivision boundaries, and it means they can manipulate the all-important county delegations in the Alabama legislature by breaking counties into multiple districts and then deciding who runs the county by putting their district in there. Now, a second question we answered that I think has been very important in this discussion, and by the way, I don't want to lose track of the fact that on remand, the Alabama legislature will have to comply with the whole county provisions, or at least they can't use this federal excuse to split them. The way most states do this is they either start with traditional districting principles in the core of existing districts and then look to see at the end, have we maintained the same number of majority-minority districts? Or if they start with a number at the beginning, which they're not required to, they ask what's necessary in current conditions to preserve the ability to elect today. That's what Alabama did in its 2001 submissions. It actually said that the number for the ability to elect was a 55% black voting-age population. That's in its official submissions to the United States. Thank you, counsel. The case is submitted.